IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
HELENA DIVISION

| | |
|---|---|
| JOSHUA DAVID GIDDINGS,<br><br>　　　　　Petitioner,<br><br>vs.<br><br>LEROY KIRKEGARD, ATTORNEY GENERAL OF THE STATE OF MONTANA,<br><br>　　　　　Respondents. | Cause No. CV 16-26-H-DLC-JTJ<br><br><br>FINDINGS AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE |

This case comes before the Court on Petitioner Joshua David Giddings's application for writ of habeas corpus under 28 U.S.C. § 2254. Giddings is a state prisoner proceeding pro se.

## I.　　Factual Background

Shortly after 5:00 p.m. on Friday, July 22, 2005, in Helena, Montana, Randy Vook (Vook) arrived home from work to find the body of his daughter, Amy Rolfe (Amy), brutally murdered and obscured under a pile of laundry.[1]  Vook and his

---

[1] The summary of the factual background is gleaned from the Montana Supreme Court's opinion on direct appeal.  See, *State v. Giddings*, 2009 MT 61, ¶¶11-37, 349 Mont. 347, 208 P. 3d 363.  Additional facts will be supplied herein where necessary.

wife shared the home with Amy, Amy's boyfriend, Mike Mix, and Amy's three young sons.

At 5:30 that evening, Joshua Giddings appeared across town at the home of John Foster.[2]  Giddings was wet, nervous, jittery, and appeared to be under the influence of methamphetamine.  Giddings advised Foster, "Mike Mix just killed his girlfriend" and described the event in lurid detail.[3]  Foster loaned Giddings some clothes to change into and provided Giddings a plastic bag upon his request.  Giddings went outside and placed items into the bag.  Foster and his girlfriend, Jennifer Casman, gave Giddings a ride to Donald Duff's (Duff) residence.  Giddings placed the plastic bag, which was now full of items, in the trunk of the vehicle.  Both Foster and Casman noticed an odor of gasoline or some other flammable liquid coming from the trunk.  Upon arrival at Duff's trailer, Giddings removed the items from the back of the trunk and attempted to give Foster a

---

[2] Earlier in the day, at approximately 3:00 p.m., Giddings had placed a phone call to Joe MacDonald from Amy's cell phone.  MacDonald did not know Amy. During the call, Giddings seemed agitated, out of breath and wanted a ride. MacDonald refused to provide a ride.

[3] While Giddings initially claimed Mix was responsible for the murder, he later contended that Richard Alan King was actually responsible and that he had only assisted King.  See e.g., Giddings's petition for PCR (Doc. 25-1 at 6, ¶21)("The focus of trial was Giddings's claim that [King] was responsible for [Amy's] murder and that he had merely assisted King in removing evidence from the scene. As such, many of the disputes at trial focused on the limitations the court placed on the evidence Giddings could present with regard to King and his proposed cross-examination of King.")

carpenter's level.  Foster refused the item.  Giddings also asked Foster for a ride to the mountains so he could burn the contents of the items from the trunk; Foster again refused.

Giddings attempted to bring the plastic bag into Duff's residence; Duff would not allow it inside.  Giddings began to explain that he had witnessed the aftermath of Mix murdering Amy and had fled from the scene.  After Casman and Foster dropped Giddings off, they drove immediately to the Helena Police Department and reported what had just happened.  Officers proceeded to Duff's residence and arrested Giddings.

In a shed outside Duff's trailer, the officers recovered the plastic bag, the carpenter's level, and some cardboard boxes.  Amy's purse, cell phone, clothing items, and sneakers were found in the plastic bag, along with other items taken from the Vook residence.  The carpenter's level, which subsequent testing revealed contained Giddings's left index fingerprint, had been removed from the Vook kitchen.

Giddings was charged on July 27, 2005, in the First Judicial District Court, Lewis and Clark County, with: Deliberate Homicide, Tampering with Evidence, Solicitation (Tampering with Witnesses or Informants), and Criminal Possession of Dangerous Drugs (methamphetamine).

Prior to Giddings's jury trial, his defense team filed a petition for a writ of supervisory control with the Montana Supreme Court, seeking to stay the trial and/or requesting the Supreme Court either overrule the trial court's denial of Giddings motions to dismiss or continue the trial based upon purported discovery violations.  The trial began as scheduled on January 8, 2007 but was stayed during voir dire while the parties awaited a decision on the writ.  The Montana Supreme Court denied the writ and determined direct appeal would provide Giddings an adequate remedy for his claimed pretrial violations.  See, *Giddings v. First Judicial District Court*, OP 07-0012, Or. (Mont. Jan. 11, 2007).[4]

The trial proceeded and Giddings was ultimately convicted of Deliberate Homicide, Tampering With/Fabrication of Evidence, and Criminal Possession of Dangerous Drugs.  See, (Doc. 1 at 2, ¶ 3).  Giddings was acquitted of Solicitation/Tampering with Witnesses.  (Doc. 19-24 at 2).  Giddings received a sentence of life without the possibility of parole for Deliberate Homicide.  On the Tampering and Criminal Possession charges, the trial court found Giddings met the statutory definition of being a Persistent Felony Offender ("PFO") and sentenced Giddings to 50 years for Tampering and 50 years for Criminal Possession.  The sentences were ordered to run consecutively to one another and consecutively to

---

[4] All state court opinions and briefing available at: https://appecm.mt.gov/PerceptiveJUDDocket/ (accessed October 19, 2020).

the deliberate homicide conviction.  (Doc. 1 at 2 at ₱4; Doc. 19-24 at 3-4).

Judgment was entered on April 6, 2007.  See, (Doc. 19-1 at 31, Doc. Seq. 448).

## II.    Direct Appeal and Collateral Proceedings

Giddings filed his notice of appeal on May 29, 2007 and his opening brief on

February 5, 2008.  The Montana Supreme Court affirmed Giddings's convictions

on all grounds.  *State v. Giddings*, 2009 MT 61, 349 Mont. 347, 208 P. 3d 363;

cert. denied, *Giddings v. Montana*, 558 U.S. 892 (Oct. 5, 2009).

### A. Direct Appeal- Pertinent Background

As discussed above, Giddings relied upon the defense of third person

culpability at trial: Giddings claimed Richard Alan King (King) killed Amy and

that he was only involved in assisting King remove items from the crime scene

after Amy's death.  Giddings's underlying criminal case involved extensive motion

practice.

On December 8, 2006, a hearing was held on Giddings's first motion to

dismiss.  There, Giddings argued the State intentionally destroyed exculpatory

evidence and failed to provide discovery.  In particular, Giddings focused on notes

Detective Mark Ekola (Ekola) took during his four interviews with King, which

were subsequently destroyed after Ekola wrote his formal reports.[5]

---

[5] See e.g., 12/8/06 Hearing Transcript (Doc. 19-8 at 5-101)(all documents and page numbers contained herein refer to this Court's numbering and not the numbers or pagination on the original documents).

A second hearing was held on January 2, 2007.  Giddings challenged the state's failure to disclose court ordered discovery and objected to the state's efforts to endorse additional jailhouse informants after indicating only one such informant would testify.[6]  While the defense was aware jailhouse informant Shannon Rawlins would likely testify at trial, they subsequently learned of the state's intent to call additional jailhouse witnesses, including John Gillette (Gillette).  The district court ultimately denied Giddings's motion.

Prior to trial the district court entered an order in limine which excluded "any testimony or other evidence concerning whether [Amy] Rolfe disliked or was afraid of Giddings,"[7] due to the highly prejudicial nature of such testimony. During trial, Candice Vook (Candice), Amy's mother, testified that Giddings called their home on July 22, 2005.  Candice asked Giddings not to call anymore and hung up the phone.  The following exchange occurred during trial:

> Q:   Okay. I don't want you to say anything that Amy said, okay? Could you describe her physical demeanor?
>
> A:   She was scared.

Outside the presence of the jury, the defense requested the prosecution be admonished not to violate the order in limine again.[8]

---

[6] See, 1/2/07 Hearing Transcript (Doc. 19-9 at 1-6.)
[7] See e.g., (Doc. 19-16 at 61:12-17.)
[8] See, (Doc. 19-10 at 159-161.)

During Detective Ekola's testimony, the prosecution elicited similar testimony that King would have been afraid of Giddings.  Giddings's defense team, outside the presence of the jury, again objected.[9]

Finally, during King's testimony, the prosecution elicited testimony that Giddings was not allowed at Amy's ex-husband's residence because she did not want him there.  The defense moved for a mistrial.[10] The district court denied the motion for a mistrial, but admonished the prosecution not to make any further inquiries of King.[11]  The defense motioned the court to lift restrictions that had been placed upon the cross-examination of King as a sanction for the prosecution's refusal to abide by the court's order.[12]  The district court denied the request.[13]

Prior to King's testimony, the parties conferred in chambers to discuss potential limitations on the cross-examination.[14]  Defense counsel believed they should be afforded wide latitude to discuss information pertaining to King's credibility and conduct, potential impeachment information, and also argued evidence showing that King killed Amy and, thus, exculpated Giddings, should be admissible.  Defense counsel argued anything having to do with King being a

---

[9] See, (Doc. 19-14 at 124-127.)
[10] (Doc. 19-16 at 60-63.)
[11] *Id*. at 73: 3-5.
[12] *Id*. at 73-74.
[13] *Id*. at 75.
[14] See generally, (Doc. 19-15 at 246-253, 257-260; Doc. 19-16 at 19- 25.)

violent man should be admitted as relevant.  The prosecution objected asserting King's prior crimes were irrelevant, that Giddings could not use specific instances of misconduct to impeach King, that what King did after the incident was not relevant to King's state of mind, and that evidence of King's assault on a former girlfriend was based solely on hearsay and was inadmissible.[15]

The district court ruled while an accused may introduce evidence tending to prove another person may have committed the crime, such evidence may also be excluded when it does not sufficiently connect the third-party to the crime.[16] Giddings was allowed to question King about his drug activity during the week of July 18, 2005, his arrest on drug charges in September of 2005, and the statements he made to Mix about bad drug deals, but the other lines of questioning were excluded.

 During trial an edited video of an interview of Giddings was played for the jury and the jurors were provided a transcript.  The state argued the videotape should be allowed in the jury room; Giddings contended it should not because it was cumulative and would place undue emphasis on Giddings's statements.[17]  The court determined the video was not testimonial.  Because Giddings did not testify

---

[15] See e.g. (Doc. 19-15 at 254-256; 19-16 at 25-26.)
[16] See, (Doc. 19-16 at 28-35.)
[17] See, (Doc. 19-21 at 112-116.)

at trial, the court determined the videotape constituted a statement that was

voluntarily given.

## B. Claims on Direct Appeal

The following issues were raised on direct appeal:

(1) the trial court erred in denying Giddings's first motion to dismiss based
    upon the destruction of Detective Ekola's handwritten notes;
(2) the trial court erred in denying Giddings's second motion to dismiss
    based upon state's late disclosure of scientific evidence, denying
    Giddings sufficient time to analyze the evidence for exculpatory and/or
    impeachment evidence;
(3) the trial court erred in endorsing two additional jailhouse informants and
    allowing them to testify at trial;
(4) the trial court erred in denying Giddings's motion for a mistrial based
    upon the State's alleged violation of the trial court's order in limine;
(5) the trial court erred in limiting Giddings's ability to cross-examine King;
(6) the trial court erred in allowing a videotape interview of Giddings to go
    to the jury room; and,
(7) the doctrine of cumulative error warranted reversal.

See generally, *State v. Giddings*, DA 07-0333, Appellant's Brief (filed Feb. 5,

2008).

## C. Montana Supreme Court Decision on Direct Appeal

The Montana Supreme Court affirmed the trial court on all grounds.  *State v.

Giddings*, 2009 MT 61, 349 Mont. 347, 208 P. 3d 363; *cert. denied, Giddings v.

Montana*, 558 U.S. 892 (Oct. 5, 2009).

As to the first issue, the Court determined that Giddings failed to establish

that Detective Ekola's notes had exculpatory value or that Ekola's conduct in

destroying his notes constituted bad faith. *Id.* at ¶¶50-51. Further, Giddings failed to demonstrate intentional or negligent suppression by the state, thus the trial court properly denied Giddings's motion to dismiss based upon the purported destruction of evidence. *Id.* at ¶54.

Regarding the late disclosure of scientific evidence, the Montana Supreme Court determined that Giddings failed to establish the State was in possession of evidence favorable to Giddings or show a reasonable probability that the evidence would have altered the outcome of trial. *Id.* at ¶60. Accordingly, Giddings failed to establish that a *Brady* violation[18] had occurred. The Court also determined Giddings failed to prove the purported State action deprived him of effective assistance or of his right to confront witnesses. *Id.* at ¶61. Thus, the trial court properly denied the defense's second motion to dismiss. *Id.* at ¶63.

In analyzing Giddings's third claim, the Court found the trial court did not abuse its discretion when it allowed the State to add two additional witnesses, Ryan Mulcahy (Mulcahy) and Gillette, one month before trial. Giddings was aware that Mulchay was a potential witness and the testimony Giddings elicited from Mulchay shed a negative light on King, not Giddings. *Id.* at ¶72-73. Further, the record did not demonstrate that the addition of these witnesses caused a

---

[18] A *Brady* violation occurs when the government fails to disclose evidence materially favorable to the accused. *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

substantial injustice to Giddings.  Giddings could not show an abuse of discretion.
*Id*. at ¶74.

Giddings's fourth claim advanced three separate violations of the trial
court's order in limine which excluded any testimony or other evidence that the
victim, Amy, was afraid of Giddings.  Giddings contended the state violated the
order by: 1) eliciting testimony from Detective Ekola that a witness advised him
King would have been afraid of Giddings; 2) eliciting testimony from Amy's
mother that when Giddings called looking for Amy, Amy's demeanor in response
to being advised of the call was "scared," 3) attempting to elicit testimony from
King as to what Amy had said in relation to Giddings.  The statement from King
was cut off by the defense's objection.

As to the first claim, the Court found there was no violation because the
order dealt with Amy and not King.  *Id*. at ¶77.  The Court went on to hold that the
statements at issue did not constitute the type of evidence that "inevitably involved
prejudice to the defendant."  *Id*. at ¶84, (citing *State v. Partin*, 287 Mont. 12, 19,
951 P. 2d 1002, 1006 (1997)).  Thus, the testimony at issue, whether taken alone or
collectively, did not prevent Giddings from having a fair trial.  The trial court did
not abuse its discretion in denying Giddings's motion for a mistrial.  *Id*. at ¶84.

The Montana Supreme Court held the trial court did not abuse its discretion
by limiting Giddings's cross examination of King.  The trial court allowed the

defense to question King about: his drug activity during the week of the homicide; his drug arrest in 2005; statements he made relative to being angry with Amy's boyfriend and wanting to cause him harm; and, finally, his 1998 conviction for deceptive practices. *Id*. at ¶86. The trial court did not allow Giddings to submit evidence that King: had committed three burglaries in 1996; was convicted of aggravated assault in 1996; was convicted of a second assault; pled guilty to Partner/Family Member Assault in 2005 following an incident where he broke his girlfriend's nose; beat up a woman named Buffy Miller; was known to carry an ax handle or tire iron; "didn't like women;" and, allegedly threatened other women would "end up like Amy" if they disobeyed his wishes. *Id*. at ¶87. Giddings sought admission of these other crimes and acts in an effort to demonstrate that King was the actual murderer. *Id*.

The Court held that while one may introduce "reverse 404(b) evidence" to inculpate another, a defendant seeking to offer evidence of prior bad acts must "clearly articulate how the evidence fits into a chain of logical inferences." *Id*. at ¶88. Such evidence may not be introduced where it lacks connection to the crime, is speculative or remote, or does not tend to prove or disprove a material fact at issue. *Id*. The Court found that the evidence that was refused constituted impermissible character evidence and was being offered to show conformity therewith. *Id*. at ¶90. The Court also noted that the validity of the evidence was

suspect because there was no logical chain of inference between the proposed evidence and Amy's murder. *Id*. at ¶91. Also, the introduction of King's purportedly violent nature did not constitute an essential element of homicide. *Id*. at ¶92. Thus, the trial court did not abuse its discretion in limiting the cross-examination of King.

In relation to Giddings's argument that he was prejudiced by the trial court allowing a videotape of the police interviewing him into the jury room during deliberations, the Court did not determine whether or not the video was testimonial in nature. Rather, the Court held the tape had limited evidentiary value due to the poor quality. Any evidentiary value came from watching the video with the aid of the transcript. *Id*. at ¶97. Therefore, allowing the tape to accompany the jury in deliberations did not unduly emphasize the video to the exclusion of other witnesses. *Id*. at ¶98. Looking at the totality of the circumstances, the video at most constituted cumulative evidence and, therefore, did not prejudice Giddings. *Id*.

The Court declined to apply the doctrine of cumulative error. It determined that consideration of each individual claim revealed that Giddings was not subjected to prejudice. *Id*. at ¶100. Finally, the Court held Giddings was not illegally sentenced to life without the possibility of parole. The sentence did not constitute an enhancement of the maximum punishment; Giddings did not receive

the death penalty.  Because life without parole fell within the range of punishments

authorized by the jury verdict under MCA §45-5-102(1), the sentence was lawful.

*Id*. at ⁋103.

### D. Petition for Rehearing

Giddings timely filed a Petition for Rehearing, pursuant to Rule 20 of the

Montana Rules of Appellate Procedure.  *State v. Giddings*, 2009 MT 61, Pet.

Re'hrg (filed March 17, 2009).  One of the issues Giddings presented was that the

Montana Supreme Court impermissibly engaged in factfinding in denying his

appeal.  *Id*. at 6-7. Giddings argued he was prevented from introducing testimony

that King had threatened Amy, had been removed from Amy's house, and that the

locks on the house had been changed because of King, not Giddings.  In upholding

the exclusion of this reverse 404(b) evidence, the Court noted that " [t]he state

appears to be correct in its assertion that Giddings committed these acts not King.

The State on August 4, 2006, moved to introduce this exact evidence about

Giddings in its response to Giddings's motion in limine to exclude 'Just'

evidence."  See, *Giddings*, ¶ 48.  The State responded that the Court was not

engaged in fact-finding, but rather was referencing information contained in the

trial court record. *State v. Giddings*, 2009 MT 61, Resp. to Pet. Re'hrg at 4-5 (filed

April 1, 2009).     The petition for rehearing was ultimately denied. *State v. Giddings*, 2009 MT 61, Or. (Mont. April 8, 2009).  [19]

### E. Postconviction Petition

On October 5, 2010, Giddings, ostensibly proceeding pro se, filed a petition for postconviction relief in the trial court.[20]  Giddings alleged: (1) his right to due process was violated because the trial prosecutor, Leo Gallagher, previously served as Giddings's defense counsel in an unrelated drug case; (2) trial counsel Randi Hood (Hood) provided ineffective assistance when she failed to move to disqualify prosecutor Leo Gallagher; (3) appellate counsel Joslyn Hunt provided ineffective

---

[19] In relation to the locks on Amy's apartment, it was revealed that at some point in time prior to her death, the locks were changed as a result of conduct by King, not Giddings.  See, e.g., PCR trns. (Doc. 28-1 at 99-100) (Hood testified this issue was resolved at a pretrial hearing and no testimony was introduced at trial that Giddings bore responsibility for the change in locks).  As explained herein, other evidence regarding Giddings purported wrongdoing and Amy's fear of Giddings was excluded in the trial court's order granting the defense's motion in limine. See e.g., Section IV.C.vi, below. But Giddings believes that the Montana Supreme Court's reference to his purported wrongdoing in relation to the changing of the locks resulted in a "defective" and "invalidated" opinion.  See, (Doc. 1 at 13, ¶ 39); see also, *Id*. at 10, ¶ 25.  Giddings then argues that the opinion on direct appeal is so flawed in its recitation and interpretation of the facts, that for purposes of this Court's review, the decision is unreasonable and this Court should engage in entirely de novo review.  But, as discussed at length below, there is an adequate and reasonable basis in the record before this Court to support the state courts decisions and the denial of Giddings's claims.

[20] Giddings has since explained that Chad Wright actually prepared his initial petition which Giddings's signature indicated was pro se. Giddings himself then prepared several pro se documents that were filed prior to Wright being formally appointed to represent him in the PCR proceedings.  See, (Doc. 29 at 2-3.)

assistance when she failed to address factual errors in the state's brief and failed to raise the issue of Giddings being absent from three pretrial hearings on direct appeal; (4) new evidence tended to show King was the murderer.  (Doc. 25-1 at 11-12.); see also (Doc. 25-2.)  The State responded to Giddings's petition and filed affidavits from lead trial counsel, Randi Hood, and from appellate counsel, Joslyn Hunt.  (Docs. 25-8, 25-9.) Giddings filed a reply. (Doc. 25-13.)

The district court deemed the matter submitted and determined an evidentiary hearing was necessary to allow the development of an appropriate record.  (Doc. 24-14.)  The court directed the Office of the Appellate Defender to appoint conflict counsel to represent Giddings.  *Id.*  Chad Wright was ultimately appointed to represent Giddings.  (Doc. 25-14.)  Although Wright was provided the opportunity to file an Amended Petition, (see, Doc. 19-26 at 3, Doc. Seq. 32), Wright neither filed an amended petition nor sought to add additional claims.

An evidentiary hearing was held on May 30, 2014.  At the hearing, Giddings called: Charles Hamlin (Hamlin), an individual who allegedly overheard a conversation involving Mike Mix; Mark Fullerton (Fullerton), a private investigator who interviewed Hamlin in April of 2010; and, Lewis and Clark County Attorney Leo Gallagher.  See e.g. (Doc. 28-1 at 6-29.)  Giddings also testified on his own behalf.  *Id.* at 30-74.  The State called Detective Mark Ekola and trial counsel Hood. *Id.* at 76-108.

16

At the hearing, Hamlin testified that he did not remember meeting with investigator Fullerton or providing an interview.  (Doc. 28-1 at 6.)  Hamlin stated he had no recollection of what he told Fullerton during the interview.  *Id*. at 7.  Hamlin denied knowing Richard Allan King or being involved in a drug deal with King in 2005.  *Id*. at 8-9.

Fullerton testified that he was involved in the investigation of Giddings's postconviction petition.  (Doc. 28-1 at 10.)  Fullerton interviewed Hamlin at the Montana State Prison in April of 2010.  *Id*. at 11.  Hamlin described an incident which occurred in 2005, a few days after Giddings was arrested, in which he overheard a conversation between King and others.  During the conversation, King said he had gotten away with something.  Hamlin concluded that "something" was Amy's murder, but he was not certain because King never said exactly what he was referencing.  *Id*. at 13-14, 19.

In support of his petition, Giddings also submitted an affidavit from Fullerton.  Fullerton indicated he interviewed a man named Jon Neuhaus (Neuhaus) in April of 2010.  Neuhaus was roommates with King at the Helena Pre-Release Center in 2004 or 2005.  Neuhaus indicated after phone calls between King and Amy, King would return to their room and say, "Fuck her" and "Fuck that bitch she's not gonna fucking leave me."  See, Fullerton Aff., (Doc. 25-1 at 23.)  While King apparently told Neuhaus he loved Amy, Neuhaus also believed

also believed King had a "huge temper" about Amy. *Id*. Neuhaus did not testify at Giddings's postconviction hearing.

On June 30, 2014, the parties submitted proposed Findings of Fact and Conclusions of Law. (Docs. 25-15; 25-16.) In his proposed Findings, Giddings conceded that he failed to meet his burden of proving Appellate Counsel Hunt provided ineffective assistance. (Doc. 25-16 at 22, ¶30.)

On January 6, 2015, the court entered Findings of Fact and Conclusions of Law denying all of Giddings's PCR claims for relief. See, (Docs. 25-17; 25-18.) Notably, the district court found that Giddings's failed to raise an IAC claim against Hood for failing to secure his presence at the pretrial hearings or advance a due process violation/claim for plain error review. The district court observed that all of the issues raised during the various pretrial hearings were either discussed again at trial, in the presence of Giddings, or could have been discussed at his request. (Doc. 25-18 at 9, ¶ 26.) The district court noted it had independently reviewed the trial transcript and found Giddings's conviction to supported by "overwhelming evidence." *Id*. at 11, ¶ 28.

In relation to any potential IAC claim Giddings could have raised, the district court observed:

> [Giddings] was represented by three experienced trial attorneys and all three attended each of the hearings at issue.[21]  Each was necessarily aware if [Giddings] was not present at a hearing.  [Giddings] clearly had opportunities to communicate with any of the three attorneys during trial.  Nothing prevented him from raising the issue of his presence at pretrial hearings.  Common sense dictates that any dissatisfaction with one of three attorneys could be cured by communication with one or both of the others.  Moreover, it undermines any claim of deficient performance.

*Id*. at 17-18, ¶ 16.  Additionally, even if Giddings had established he was not at one or more of the pretrial hearings due to a deficiency on the part of one of his three trial attorneys, he failed to demonstrate he was prejudiced by his  purported absence:

> While [Giddings] alleges that he would have interacted with his attorneys during the pretrial hearings, in discussing the outcome of his case he focuses on trial testimony and trial strategy.  There is no basis on which to find that his presence at the pretrial hearings would have changed the outcome of the hearings or the outcome of the trial.

*Id*., at 19, ¶ 20.

The Court concluded Giddings failed to establish deficient performance and failed to establish prejudice due to his purported absence from the pretrial hearings; accordingly, any error that ensued was harmless.  *Id*. at 20, ¶ 23.  Giddings failed to show, that had he been present at the pretrial hearings, a reasonable probability exists that the proceedings would have had a different

---

[21] In addition to Hood, Giddings was also appointed two other attorneys, Al Avignone and Lisa Bannick.

result.  In short, there was no basis upon which to conclude that the result was unreliable or the proceedings fundamentally unfair.  *Id*. (citations omitted).

In relation to Giddings's claim of newly discovered evidence, the district court found the evidence presented was not reliable.  *Id*. at ¶ 28.  The court noted Hamlin did not present evidence of any specific statement regarding the homicide. Instead there was some discussion from Hamlin, who later told Fullerton, that over four years prior, he overheard a person involved in a drug transaction outside the car say something about getting away with something.  *Id*.  During the hearing, Hamlin stated he remembered nothing, "including the person who allegedly spoke the words, the investigator who interviewed him, and the entire scenario."  *Id*. Because the evidence was not trustworthy, the court declined to analyze this information in light of the evidence presented at trial.  *Id*. at ¶¶ 28-29, citing *State v. Beach*, 2013 MT 130, ¶ 78.  The court did not address any of the information Neuhaus reportedly supplied to Fullerton.

### F.  Direct Appeal from Denial of Postconviction Petition

On March 5, 2015, Wright filed a Notice of Appeal on Giddings's behalf. See, *Giddings v. State*, DA 15-0138, Not. of App. (March 5, 2015).  In his opening brief Giddings raised the following issues: (1) his state and federal right to be present and participate in his defense was violated when he was excluded from three critical pretrial hearings; (2) his state and federal constitutional right to

effective assistance of counsel was violated when his attorney failed to object to the conflict created by his former defense attorney prosecuting him for homicide; and, (3) his new evidence claims needed to be remanded for consideration under the Montana Supreme Court decisions of *Marble v. State* and *Wilkes v. State*.  See generally, *Giddings v. State*, DA 15-0138, Appellant's Brief (filed October 28, 2015).

On October 29, 2015, Giddings filed a pro se motion for an order for stay and abeyance and a motion for leave to terminate Wright as his appellate counsel. See, *Giddings v. State*, DA 15-0138, Pro Se Motion for Order for Stay and Abeyance (filed October 29, 2015).  Giddings also requested new counsel be appointed.  In his motion, Giddings expressed his relationship with Wright had deteriorated, that a conflict of interest had developed, and that he no longer had confidence in Wright's representation.  *Id*. at 1-3.

The Montana Supreme Court denied Giddings's motion for stay and abeyance, denied his motion to appoint new counsel, and denied his request for a 90-day extension to file his opening brief.  The Court granted his motion to terminate counsel.  *Giddings v. State*, DA 15-0138, Or. (filed November 10, 2015). Giddings was given until December 10, 2015, to file a brief and was advised that he should inform the Court if the brief was to be considered in place of the opening brief filed by Wright or as a supplement to the opening brief.  *Id*. at 2.  Giddings

was further advised that if he failed to file a brief, the Court would treat the brief filed by Wright brief as the opening brief.  *Id*.

Giddings filed a supplemental brief wherein he reiterated the same three issues outlined in Wright's brief and provided additional facts.  See, *Giddings v. State*, DA 15-0138, Supplemental Br., at 3-9 (filed December 14, 2015); see also, (Doc. 25-23 at 4-10.)

The State responded on March 4, 2016.  See, (Doc. 25-25.) The state contended the trial court properly denied Giddings's ineffective assistance of appellate counsel and trial counsel claims and also properly denied relief on Giddings's claim that new evidence supported his innocence.

The Montana Supreme Court affirmed the district court's denial of Giddings's PCR petition.  See, *Giddings, v. State*, Or. 2016 MT 139N (Mont. June 7, 2016).

On appeal, Giddings essentially argued his fundamental right to be present and participate in his own defense was violated when he was precluded from appearing at three pretrial hearings, in particular the January 2, 2007 hearing.  *Id*. at ¶ 11.  Giddings contended that had he appeared at that hearing he could have shared pertinent information about Gillette and the favorable treatment he received in exchange for his testimony against Giddings.  *Id*.

The Court noted that in his PCR petition, Giddings's only claim regarding these hearings was that appellate counsel was ineffective for failing to raise the issue on appeal.  *Id*. at ¶ 12.  The district court held that appellate counsel did not perform deficiently because the record was unclear as to whether or not Giddings was actually present at these hearings.  Accordingly, appellate counsel could not have raised the issue on direct appeal and Giddings ultimately conceded as much in his proposed findings of fact and conclusions of law.  *Id*.  Additionally, Giddings failed to raise an IAC claim against trial counsel and/or a due process claim in his petition and, despite being provided the opportunity, failed to amend his PCR petition.  *Id*.  Nonetheless, the district court addressed these claims and found they lacked merit.

The Court determined the district court's findings were reasonable and noted Giddings did not present these personal presence claims as either IAC or due process claims at trial, on direct appeal, or in his PCR petition.  *Id*. at ¶ 15. Additionally, the Court held Giddings failed to meet his burden to convince the Court to invoke the plain error doctrine[22] to reverse the denial of his PCR petition.

_____

[22] Under Montana law, to obtain plain error review, the appealing party must: (1) show that the claimed error implicates a fundamental right and (2) firmly convince the Court that failure to review the claimed error would result in a manifest miscarriage of justice, leave unsettled the question of the fundamental fairness of the trial or proceedings, or compromise the integrity of the judicial process.  See e.g., *State v. Favel*, 2015 MT 336, ¶ 23.  Such review is discretionary and applied on a case-by-case basis.  *Id*.

The Court also observed that any speculative conclusions Giddings had relative to Gillette's testimony could have been shared with counsel during trial when Gillette testified and was subjected to a lengthy cross-examination. *Id*.

In relation to Giddings's claim that his newly discovered evidence warranted remand for consideration under *State v. Marble*, the Court noted that evidence still must meet the threshold requirements for reliability. *Id*. at ¶ 18. The Court held that the district court properly found that Giddings's evidence was unreliable and affirmed denial of the claim.

### III. Giddings Claims

Before this Court, Giddings advances the following claims:

(1)     PCR appellate counsel, Chad Wright, was ineffective in violation of the 6th Amendment, (Doc. 1 at 4-16);

(2)     his right to due process and effective assistance of counsel was violated when Wright was appointed to represent him during PCR proceedings, despite a purported conflict of interest, *Id*. at 17;

(3)     his constitutional right to be present during a "critical stage" was violated when he was excluded from a hearing on August 25, 2006, *Id*. at 18-19;

(4)     his constitutional right to be present during a "critical stage" was violated when he was excluded from a pre-trial hearing held on November 29, 2006, *Id*. at 19-20;

(5)     his constitutional right to be present during a "critical stage" was violated when he was excluded from a December 8, 2006 pre-trial hearing, *Id*. at 21-22;

24

(6)      his constitutional right to be present during a "critical stage" was violated when he was excluded from a January 2, 2007, pre-trial hearing, *Id.* at 22-24;

(7)      the government violated his constitutional rights by destroying exculpatory evidence, *Id.* at 24-26;

(8)      his constitutional rights were violated when a videotape of his interview with police officers was sent to the jury during deliberations, *Id.* at 26-28;

(9)      his constitutional rights were violated by the government's untimely disclosure of "exculpatory and inculpatory evidence, intentional suppression of evidence, and multiple discovery abuses," *Id.* at 28-29;

(10)      his constitutional rights were violated when the government sought and received last minute endorsement of two jailhouse informants, *Id.* at 29-32;

(11)      his constitutional rights were violated when the trial court unjustly limited the cross-examination of King and a further violation occurred when the state courts failed to remand his new evidence/innocence claim for proper consideration, *Id.* at 32-37;

(12)      his constitutional rights were violated when the government intentionally solicited testimony in violation of the trial court's order in limine, *Id.* at 37-38;

(13)      the government tampered with and/or fabricated evidence in violation of his constitutional rights, *Id.* at 38-39;

(14)      cumulative error occurred, *Id.* at 39-42; and,

(15)      his sentence is illegal, *Id.* at 42-44;

//

//

### IV.   Analysis

Giddings should not be provided relief.  As discussed below, several of his claims are not cognizable in federal habeas, one claim is procedurally defaulted, and the remaining claims do not survive deferential review under AEDPA.

### A. Non-Cognizable Claims

To be eligible for federal habeas corpus relief, a state prisoner must establish that he is "in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a); *Williams v. Taylor*, 529 U.S. 362, 375 (2000).  But Giddings's claims relative to his PCR proceedings and his sentence do not advance a cognizable federal constitutional violation, accordingly, they should be denied.

### i.   Claims 1 & 2- State PCR Proceedings/PCR Counsel

Giddings claims that PCR counsel/PCR appellate counsel, Chad Wright, was ineffective in violation of the 6th Amendment during his representation.  Giddings believes his right to due process and effective assistance of counsel was violated when Wright was appointed to represent him during PCR appellate proceedings, despite an obvious conflict of interest.  As previously explained, both of these claims are procedurally defaulted.  See e.g., (Doc. 26 at 6-9.)  But the default matters not at this juncture, because neither claim is cognizable in federal habeas.

There is no freestanding federal constitutional right to an attorney in state postconviction proceedings.  *Pennsylvania v. Finley*, 481 U.S. 551, 556-57 (1987); *Murray v. Giarratano*, 492 U.S. 1 (1989).  Consequently, a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings.  See, *Wainwright v. Torna*, 455 U.S. 586 (1982)(where there is no constitutional right to counsel there can be no deprivation of effective assistance); see also, *Franzen v. Brinkman,* 877 F. 2d 26, 26 (9th Cir. 1989)(per curiam)(holding that claims of error during state postconviction proceedings are not cognizable on federal habeas review).  Further, relief is precluded by statute.  *See*, 28 U.S.C. § 2254(i) (providing "ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254.")  These claims, considered as straight assertions against PCR proceedings and/or PCR counsel, should be denied.

### Consideration of *Martinez* to excuse default of an IAC claim

As set forth above, because there is no constitutional right to counsel in state PCR proceedings, the absence or ineffective assistance of state post-conviction counsel generally cannot establish cause to excuse a procedural default.  See, *Coleman v. Thompson*, 501 U.S. 722, 752-54 (1991).  *Martinez v. Ryan*, 566 U.S. 1 (2012), however, established a limited equitable exception to this general rule, that only applies to Sixth Amendment ineffective assistance of trial counsel claims.

*Martinez* held that inadequate assistance of postconviction counsel or lack of counsel at initial collateral proceedings "may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." 566 U.S. at 14.

In providing Giddings the benefit of the doubt, this Court has read his claims against postconviction counsel broadly to include the possibility that *Martinez* may serve to excuse the procedural default of a claim that Wright failed to raise regarding Hood's failure to secure his presence at three pretrial hearings.[23] The Court previously expressed skepticism regarding this precise claim, because Giddings was aware of the claim as early as September 28, 2012, and of his ability to advance the claim in an Amended PCR Petition. See e.g. (Doc. 25-13 at 5); see also, (Doc. 26 at 13-14); (Doc. 25-18 at 17, ¶ 14.) Interestingly, Giddings asserted in his initial PCR filings that he was not faulting Hood for his absence from the pretrial hearings, rather, he laid blame at Joslyn Hunt, his attorney on direct appeal, for failing to present the claim to the Montana Supreme Court. See, (Doc. 26 at 5)("Nowhere in [my] PCR petition, Memorandum in Support, or [my] affidavit [do I] blame Hood for [my] exclusion from pre-trial 'critical stage' hearings. In fact, [I] only [argue] that Joslyn Hunt was ineffective for not raising this issue on appeal.")[24] It is undisputed that despite being provided the opportunity to do so,

---

[23] Giddings's pretrial presence claims are discussed further below at IV.B.(i).

[24] Giddings ultimately conceded that the IAC claim against Hunt lacked merit.

neither Giddings nor PCR counsel Wright filed an Amended PCR Petition.  (Doc.

25-18 at 17, ¶ 14); (Doc. 29 at 3-4.)

To the extent that Giddings believes *Martinez* should excuse the procedural

default of a purported IAC claim against Hood for failing to secure his presence at

various pretrial proceedings, Giddings must demonstrate his claim against Hood is

substantial and that Wright provided ineffective assistance during the PCR

proceedings by failing to raise the claim.[25] "Because *Martinez* requires a showing

that post-conviction counsel was ineffective under the standards of *Strickland*,[26] a

petitioner who was represented by postconviction counsel in his initial-review

collateral proceeding must show not only that his procedurally defaulted trial-level

_____

[25] In *Trevino v. Thaler*, the Supreme Court described the four-prong *Martinez* analysis as requiring a petitioner to show the following: (1) that his ineffective assistance claim of trial counsel claim is "substantial;" (2) that he had no counsel or ineffective counsel during the state collateral review proceeding; (3) that the state collateral review proceeding was the "initial" review proceeding where the ineffective assistance of trial counsel claim could be raised; and (4) that state law requires ineffective assistance of trial counsel claims to be raised in initial-review collateral proceedings. 569 U.S. 413, 423 (2013); see also, *Martinez*, 566 U.S. at 13-17.

[26] Claims of ineffective assistance are governed by *Strickland v. Washington*, 466 U.S. 668 (1984).  Petitioner must show both that counsel's performance fell below an objective standard of reasonableness, *id*. at 687-88, and that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id*. at 694.  "[T]here is no reason . . . to address both components of the inquiry if [the petitioner] makes an insufficient showing on one."  *Id*. at 697.

IAC claim is substantial but also that there is 'a reasonable probability that the trial-level IAC claim would have succeeded had it been raised' by postconviction counsel." *Rodney v. Filson*, 916 F. 3d 1254, 1260 (9th Cir. 2019)(quoting *Trevino*, 569 U.S. at 423).

But as discussed, the district court noted that even if it were to consider the merits of Giddings's IAC claim against Hood, he failed to meet the deficient performance prong of *Strickland*.  See, (Doc. 25-18 at 17-18, ¶ 16.)  Additionally, while the record remains unclear regarding whether or not Giddings was, in fact, absent from all of the hearings, even assuming he was not present due to deficient performance by Hood, the PCR court found Giddings failed to demonstrate the requisite prejudice.  That is, he failed to demonstrate a reasonable probability that had he been present, the result of either the hearings or the outcome of his trial would have been different.  *Id*. at 19, ¶¶ 19-20.

In response to this Court's order regarding the potential application of *Martinez*, Giddings provides no more compelling argument than that he attempted to advance below.  He provides his own conclusory statements about what he believes could have happened.

For example, Giddings asserts that had he known about the duties Hood had undertaken as head of the state public defender system, it would have prompted him to "appoint new lead counsel" following the November 29, 2006 hearing.

(Doc. 29 at 7.)  Likewise, had he been present for the December 8, 2006 hearing, Giddings would have pressed for the exclusion of Detective Ekola from testifying, would have sought additional sanctions for purported *Brady* violations, and also would have informed counsel of Ekola's extreme animus toward him.  *Id*. at 8-9. Additionally, Giddings would have insisted defense counsel call Tara Weller as a witness because she possessed allegedly exculpatory information and this, in turn, would have likely prompted Giddings to take the stand and testify in his own defense at trial.  *Id*. at 8.  Finally, had Giddings attended the January 2, 2006 hearing, he posits that he would have provided investigative leads to his attorneys that would have altered decisions made regarding the testimony from two "jailhouse snitches."  *Id*. at 9.  He also would have informed his attorneys that he was aware witness Gillette was gleaning information about Amy's death from his sister via the jailhouse phone system and was using this information to manufacture unfavorable testimony against Giddings.  *Id*.  Had Giddings provided this information, he believes Gillette would have been prevented from testifying or, at least, been subject to a greater degree of impeachment, likely rendering a different trial outcome. [27] *Id*. at 9-10.

---

[27] As discussed below, Gillette was subject to a lengthy cross-examination and corresponding impeachment.  See, Section IV.c.iv.

But, as discussed further below, Giddings has not demonstrated that any of these claims have merit.  Giddings was represented by three highly experience trial attorneys who were capable to dividing responsibilities and determining who should act as "lead counsel."  Additionally, also discussed below, the purported *Brady* violations and actions of Detective Ekola were litigated heavily and contentiously.  The Court presumes Giddings, whether he was present for the pretrial hearings or not, would have had ample opportunity to share with counsel: any exculpatory evidence he had, information regarding potential witnesses and their testimony, and his own thoughts on Ekola's perception of him.

But critical to the potential consideration of this claim, Giddings has failed to establish that claim his IAC claim against Hood is "substantial" for purposes of *Martinez*, or that Wright provided ineffective assistance during the underlying PCR proceedings for failing to amend the petition to include this claim.  Thus, Giddings cannot avail himself of *Martinez* to raise the procedurally defaulted IAC claim before this Court.

### ii.  Claim 15- Legality of State Sentence

On March 29, 2007, Giddings was sentenced to the Montana State Prison for Life, without the possibility of parole.  Additionally, the district court determined

that Giddings was a persistent felony offender (PFO),[28] and sentenced him to 50 years for Count II, Tampering with/or Fabricating Physical Evidence, and 50 years for Criminal Possession of Dangerous Drugs (methamphetamine).  The sentences were ordered to run consecutively to each other.  See, Judg. (Doc. 19-24 at 3-4.)

In his federal petition, Giddings claims that the State of Montana imposed an illegal sentence in violation of his right to due process and right to be free of double jeopardy when it imposed a life without parole sentence and sentenced him twice as a persistent felony offender above and beyond the statutory maximum. (Doc. 1 at 42-44.)

On June 20, 2016, Giddings applied for review of his sentence before the Sentence Review Division  of the Montana Supreme Court (SRD).  (Doc. 28-2.) Following a hearing on November 17, 2016, the SRD found that Giddings's Life without Parole sentence was not clearly excessive.  (Doc. 28-4 at 2.)  The SRD did find, however, that the PFO sentences were clearly excessive when compared to other similar cases and in consideration of the life without parole sentence.  *Id.*

_____

[28] Under state law in effect at the time of Giddings's sentencing, a "persistent felony offender" was an offender who had previously been convicted of a felony and was being sentenced for a second felony committed on a different occasion than the first within a five-year time-period.  See, MCA 46-18-501 (2005).  The trial court found that less than 5 years had elapsed between the commission of Giddings offense in Cause No. CDC 2005-260 and his release on parole from another commitment imposed in Cause No. ADC 98-52 and his conviction in Cause No. ADC 2004-342.  (Doc. 19-24 at 3-4).  Accordingly, Giddings was designated a persistent felony offender.

The SRD decreased each PFO sentence to 10 years and ordered that they run consecutively to each other and to the life without parole sentence. *Id*.

Generally, challenges to a state's application of its own sentencing laws are not cognizable on federal habeas review. See, *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990). Despite attempting to couch his claim in federal law, Giddings's challenge is a matter of state sentencing law and, absent fundamental unfairness, is not cognizable on federal habeas review. *Estelle*, 502 U.S. at 72-73; *Souch v. Schaivo,* 289 F. 3d 616, 623 (9th Cir. 2002); *Brown v. Mayle*, 283 F. 3d 1019, 1040 (9th Cir. 2002)(vacated on other grounds).

As a preliminary matter, for the deliberate homicide, Giddings could have been punished by death, life imprisonment, or a term not less than 10 years or more than 100 years. See, MCA 45-5-10(2)(2005). Giddings did not receive a death sentence. Additionally, Giddings did receive relief from the SRD. Although he may still disagree with the ultimate sentence imposed, he has not shown that either the sentence he received or the SRD proceedings were fundamentally unfair. Because the claim Giddings presents is actually a claim of state court error in the application of state sentencing law, the claim is not cognizable on federal habeas review. The claims should be denied.

//

//

## B. Procedurally Defaulted Claim

Before a state prisoner may present a claim to a federal court, he must first exhaust his available state remedies.  28 U.S.C. § 2254(b)(1)(A); *Baldwin v. Reese*, 541 U.S. 27, 29 (2004).   To do so, the petitioner must invoke one complete round of the state's established appellate review process, fairly presenting all constitutional claims to the state courts so that they have a full and fair opportunity to correct alleged constitutional errors at each level of appellate review. *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999).  The exhaustion requirement prevents the federal court from "upset[ting] a state court conviction" without first allowing the state courts an "opportunity to…correct a constitutional violation." *Rose v. Lundy*, 455 U.S. 509, 518 (1982).

When a habeas petitioner has not fairly presented a constitutional claim to the highest state court, and it is clear that the state court would now refuse to consider it because of the state's procedural rules, the claim is said to be procedurally defaulted. *Gray v. Netherland*, 518 U.S. 152, 161-62 (1996).

### Claim 13-State Tampering/Fabrication of Evidence

Giddings claims that the government tampered with and fabricated evidence in violation of his constitutional rights.  In support of this claim, Giddings states that Ekola's desire to get a conviction "at any and all costs," resulted in a threat being made to Giddings's mother, Connie Hash (Hash).  On April 14, 2016,

Giddings provided an affidavit from Has to this Court. Hash affirms that sometime in 2003 or 2004, Ekola came into her place of business and "with a very arrogant and cocky attitude" stated that he was going to make sure that Giddings "went to prison for the rest of his life." (Doc. 6 at 1.) In response, Hash asked him to leave. *Id*.

During Giddings's postconviction hearing, an issue came up surrounding Ekola's collection of a urine sample from Giddings following Amy's murder. Giddings testified he was concerned and "wanted to place evidence tape over the sample and Detective Ekola said I was not allowed to handle it." (Doc. 28-1 at 40.) Giddings claims that before they went into the bathroom together, Ekola threatened him that he would be tased if he didn't comply with collection of the sample. *Id*. Giddings subsequently inferred that Ekola must have tampered with the sample because it came back positive for methamphetamine when his blood tests were negative. *Id*.

Ekola also testified during the PCR hearing. When asked if he threatened Giddings during the collection of his urine sample, Ekola stated, "I absolutely did not do that." *Id*. at 78; 80.

In his pending petition, Giddings claims that the Ekola UA issue was presented to the Montana Supreme Court on direct appeal from the PCR proceedings. (Doc. 1 at 39.) The collection and purported tampering with the UA

sample, while mentioned during the PCR proceedings and in Giddings's

supplemental brief on appeal,[29] was never raised as a stand-alone claim.  The

alleged threat Ekola made to Hash was never discussed during the PCR hearing nor

was it raised in Giddings's petition or appeal therefrom.  Thus, to the extent that

Giddings now attempts to raise a tampering with evidence claim before this Court,

such a claim was not properly presented to the state courts for review.  Because

Giddings failed to comply with state procedural rules and/or raise this precise

claim at the state level, the claim is procedurally defaulted.  See, *Peterson v.*

*Lampert*, 319 F. 3d 1153, 1156 (9th Cir. 2003)(*O'Sullivan v. Boerckel*, 562 U.S.

838, 844-45 (1999).  Accordingly, this Court will not review the claim in federal

habeas.

### C. Review of Remaining Claims under AEDPA

To be eligible for federal habeas corpus relief, a state prisoner must establish

that he is "in custody in violation of the Constitution or laws or treaties of the

United States."  28 U.S.C. §2254(a); *Williams v. Taylor*, 529 U.S. 362, 375 (2000).

A state prisoner "whose claim was adjudicated on the merits in state court is not

entitled to relief in the federal court unless he meets the requirements of 28 U.S.C.

§2254(d)."  *Price v. Vincent*, 538 U.S. 634, 638 (2003).  This Court's analysis of

---

[29] See e.g., (Doc. 25-23 at 8).

the merits of Giddings's remaining claims is constrained by the applicable standard of review.

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) applies to Giddings's petition because it was filed after 1996. AEDPA substantially limits the power of federal courts to grant habeas relief to state prisoners, *Hurles v. Ryan*, 725 F. 3d 768, 777 (9th Cir. 2014), and "demands that state court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam). Thus, if a petitioner's claim has been "adjudicated on the merits" in state court, "AEDPA's highly deferential standards kick in." *Davis v Ayala*, 576 U.S. 257, 269 (2015) (citations omitted).

Under the deferential standard of AEDPA, a federal court may not grant a prisoner's petition on a claim that was decided on the merits in state court, unless the state court's decision: 1) "was contrary to federal law then clearly established in the holdings of [the United States Supreme Court]"; 2) "involved an unreasonable application of such law"; or 3) "was based on an unreasonable determination of the facts in light of the record before the state court." *Harrington v. Richter*, 562 U.S. 86, 100 (2011) (internal quotation marks omitted); see also, 28 U.S.C. §2254(d), *Lockyer v. Andrade*, 538 U.S. 63, 70-71 (2003).[30] "A state

---

[30] 28 U.S.C. §2254(d) is a gateway. If a petitioner satisfies either subsection (1) or (2) for a claim, then the federal court considers that claim de novo. See, *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007) (when section 2254(d) is satisfied, "[a]

court's determination that a claim lacks merit precludes federal habeas relief so long as 'fair minded jurists could disagree' on the correctness of the state court's decision." *Richter*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

"'[C]learly established Federal law'… is the governing legal principle or principles set forth by the Supreme Court [in its holdings] at the time the state court renders its decision." *Lockyer,* 538 U.S. at 70-71; see also, *Carey v. Musladin*, 549 U.S. 70, 74 (2006),  In addition, the Supreme Court decision must "squarely address [ ] the issue in the[e] case; otherwise, there is no clearly established Federal law for purposes of review under AEDPA." *Moses v. Payne*, 555 F. 3d 742, 754 (9th Cir. 2009), quoting *Wright v. Van Patten*, 552 U.S. 120, 125 (2008).  If no clearly established federal law exists, the inquiry is at an end and the court must defer to the state court's decision.  *Carey*, 549 U.S. at 70; *Wright*, 552 U.S. at 126.

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at

_____

federal court must then resolve the claim without the deference AEDPA otherwise requires"); see also, *Cone v. Bell*, 556 U.S. 449, 472 (2009).

412-12; see also *Lockyer*, 538 U.S. at 72.  "A state-court decision will certainly be contrary to [Supreme Court] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases."  *Id*. at 405.

"Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  *Williams*, 529 U.S. at 413. A state court decision involves "an unreasonable application of clearly established Federal law" if "there is no possibility fair minded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents."  *Richter*, 562 U.S. at 102.  That is, a petitioner "must show that the state court's ruling on the claim being presented in a federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair minded disagreement."  *Id*. at 103.  Or, to put it another way, so long as fair-minded jurists could disagree on the correctness of the state court's decision, the decision cannot be considered unreasonable.  *Id*. at 98-99.

Under §2254(d)(2), the federal court reviews purely factual questions that were resolved by the state court.  *Lambert v. Blodgett*, 393 F. 3d 943, 978 (9th Cir. 2004).  "[T]he question on review is whether an appellate panel, applying the

normal standards of appellate review, could reasonably conclude that the finding is supported by the record." *Id.* Section (d)(2) "applies most readily to situations where petitioner challenges the state court's findings based entirely on the state record. Such a challenge may be based on the claim that the finding is unsupported by sufficient evidence…that the process employed by the state court is defective… or that no finding was made by the state court at all." *Taylor v. Maddox*, 366 F. 3d 992, 999 (9th Cir. 2004), abrogated on other grounds by *Murray v. Schiro*, 745 F. 3d 984, 999-1000 (9th Cir. 2014). If "reasonable minds reviewing the record might disagree about the finding in question, 'on habeas review that does not suffice to supersede the trial court's …determination.'". *Brumfield v. Cain*, __ U.S. __, 135 S. Ct. 2269, 2277 (2015)(citations omitted). A state court's factual determinations are presumed to be correct, and a petitioner bears the "burden of rebutting this presumption by clear and convincing evidence." 28 U.S.C. 2254( e)(1).

"For relief to be granted, a state court merits ruling must be so lacking in justification that there was an error…beyond any possibility for fair minded disagreement." *Bemore v. Chappell*, 788 F. 3d 1151, 1160 (9th Cir. 2015). "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' …and 'demands that state-court decisions be given the benefit of the doubt.'" *Renico v. Lett*, 559 U.S. 766, 773 (2010). The standard is " 'difficult to

meet,'" and a "petitioner carries the burden of proof." *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011).

For the reasons set forth below, Giddings cannot overcome this deferential standard and the remaining claims should be denied.

### i.   Claims 3-6: Right to be Present/Critical Stage Claims

"[T]he right to personal presence at all critical stages of the trial and the right to counsel are fundamental rights of each criminal defendant." *Rushen v. Spain*, 464 U.S. 114, 117 (1983) (per curiam). "By the Court's limitation of this right to 'critical stages of the trial,' clearly, a criminal defendant does not have a fundamental right to be present at *all* stages of the trial." *La Crosse v. Kernan*, 244 F.3d 702, 707-08 (9th Cir. 2001). Instead, "a defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure," *Kentucky v. Stincer*, 482 U.S. 730, 740 (1987), that is, "whenever his presence has a relation, reasonably substantial, to the fulness of his opportunity to defend against the charge," *Snyder v. Massachusetts*, 291 U.S. 97, 105-06 (1934). The defendant need not be present "when [his] presence would be useless, or the benefit but a shadow." *Id.* at 106-07. Further, counsel may waive the defendant's right to be present in person even at a critical stage of the proceeding, or the defendant may consent to exclusion. *E.g.*, *Campbell v. Wood*, 18 F.3d 662, 670-72 (9th Cir. 1994)

(en banc).  Violation of the right to be present is trial error subject to review for

harmless error, not structural error.  *Campbell v. Rice*, 408 F.3d 1166, 1172 (9th

Cir. 2005) (en banc).

Giddings alleges he was absent from four separate "critical stage" pretrial

hearings: an August 25, 2006, hearing during which Hood discussed the newly

formed Office of the State Public Defender and her substantial duties as Chief

Public Defender, see (Doc. 1 at 18-19);[31] a November 29, 2006 hearing in which

Hood again discussed her obligations and time commitments as head of the OPD

and requested a continuance of Giddings's trial, *id*. at 19-20;[32] a December 8, 2006

hearing addressing the defense's motion to dismiss during which potential

testimony of Duff was discussed, as was the UA sample taken from Giddings on

July 23, 2005 by Detective Ekola, *id*. at 21-22;[33] and a January 2, 2007 hearing,

---

[31] This hearing was never addressed in Giddings PCR proceedings or the appeal
therefrom.  See e.g., (Doc. 25-19 at 13-18) (Appellant's opening brief identifying 3
pretrial hearings from which Giddings was excluded, not 4 hearings); see also,
5/30/14 Hrg. Trns, (Doc. 28-1 at 75)(no reference made to August 25, 2006
hearing).

[32] Avignone also argued in support of the requested continuance that certain
discovery items had not yet been provided and that the defense believed some
items of evidence had been destroyed.  No witness testified at this hearing.  See
e.g. (Doc. 25-1 at 4, ¶ 11); see also, 11/29/05 Hrg. Trns. (Doc. 19-7.)

[33] Detective Ekola testified at this hearing regarding his witness interviews and his
decision to charge Giddings rather than King.  Following the testimony, the parties
engaged in extensive legal argument.  See e.g., (Doc. 25-1 at 4-5); see also,
12/8/06 Hrg. Trns. (Doc. 19-8.)

during which Detective Ekola testified regarding, among other things, the destruction of his interview notes and, according to Giddings, "evidence Ekola tampered with." *Id.* at 22-23.[34]

It appears Giddings was transported from the Montana State Prison to Helena for the January hearing, although not in time to attend the proceedings. See, *Id.* at 23. The state court record is unclear as to whether or not Giddings was, in fact, absent from the remaining hearings.

### a.  Claim 3: August 25, 2006 Hearing

As set forth above, see fn. 22 *supra*, this hearing was never addressed in Giddings PCR proceedings or the appeal therefrom; thus it was not properly presented to the state courts. A petitioner procedurally defaults his claim if he fails to comply with a state procedural rule or fails to raise his claim at the state level. *Peterson v. Lampert*, 319 F. 3d 1153, 1156 (9th Cir. 2003)(citing *O'Sullivan v. Boerckel*, 562 U.S. 838, 844-45 (1999). Accordingly, this claim is procedurally defaulted and this Court will not review it.

### b.  Claims 4 & 5: November 29, 2006/December 8, 2006 Hearings

---

[34] This was a second hearing on the defense's motion to dismiss based upon continued discovery disputes. Detective Fisher testified about his investigation into the criminal backgrounds of the State's witnesses, Detective Ekola testified about his investigation regarding recently disclosed "jailhouse snitches" and the Witness/Victim Coordinator testified about information that had been provided to the defense. See e.g. (Doc. 25-1 at 5.)

The record is unclear as to whether or not Giddings was actually absent from either or both of these hearings.  In its order denying PCR relief, the court did not find that Giddings was absent.  In relation to the November hearing, Hood testified that Giddings waived his right to be present.  On appeal from the denial of his PCR petition, Giddings focused on the January hearing, but not either of these two hearings.  Accordingly, the Montana Supreme Court's decision addressed only the January hearing, and neither the November 29th nor December 8th Hearing.  See, *Giddings v. State*, 2016 MT 139N, ¶ 15.  No finding has been made that Giddings failed to attend these hearings.

The state's factual determination that Giddings failed to establish his absence from either hearing is presumed to be correct.  Moreover, Giddings has not met his burden of rebutting this presumption by clear and convincing evidence.  See, 28 U.S.C. 2254( e)(1).  Because reasonable minds reviewing the state court record might disagree about Giddings's purported absence, this Court will not disturb the state court finding.  See, *Brumfield*, 135 S. Ct. at 2277.  These two claims should be denied.

### c.  Claim 6: January 2, 2007 Hearing

As set forth above, in relation to this claim, the Montana Supreme Court did not find that Giddings met his burden to convince the court to invoke the plain error doctrine.  *Giddings v. State*, 2016 MT 139N, ¶ 15. In support of this finding,

the Court noted Giddings offered "only speculation" that Gillette was afforded special treatment in exchange for his trial testimony against Giddings.  *Id*. Additionally, the Court found that Gillette testified during trial in Giddings's presence and was subject to a lengthy cross examination regarding his criminal record and any favors the state may have provided in exchange for his testimony. *Id*.  The Court opined that Giddings could have provided any information he had relating to Gillette's credibility to trial counsel.  *Id*.

Before this Court, Giddings now claims had he been at the January 2007 hearing, he would have had the opportunity to confront Detective Ekola and glean information regarding the exculpatory evidence that had purportedly been destroyed. See, (Doc. 1 at 23.)  But, as set forth above the issues surrounding Detective Ekola's investigative practices were well known to the parties and were not only the subject of the January 2007 hearing, but also the December 2006 hearing, in which Giddings's defense team presented argument in support of the motion to dismiss.  Additionally, the discovery abuses, including those allegedly committed by Detective Ekola, were not only litigated extensively in the district court, they were presented to the Montana Supreme Court on two separate occasions: first, in Giddings's pretrial writ for emergency supervisory control, See, *Giddings v. First Judicial District*, OP 07-0012, Or. (Mont. Jan. 11, 2007), and on direct appeal, see, *State v. Giddings*, 2009 MT 61, ¶¶44-54.  All three members of

Giddings's defense team vigorously litigated the issue at every opportunity. While it is not to suggest that Giddings's presence at the hearing would have been useless, this Court is hard-pressed to see, in consideration of the totality of the circumstances, what actual harm resulted from Giddings's absence from the January 2007 hearing. See e.g., *Campbell*, 408 F.3d at 1172. Because there was a reasonable basis to deny this claim, deference must be afforded. 28 U.S.C. § 2254(d).

### ii.   Claims 7 & 9- Destruction of Evidence/*Brady* Violations

Giddings claims Detective Ekola destroyed exculpatory evidence, specifically his witness interview notes, and failed to record three separate interviews of King, in violation of his constitutional rights. See, (Doc. 1 at 24-25.) Giddings argues that during Ekola's first interview with King on July 23, 2005, Ekola failed to "immediately serve a warrant on [King's] body and personal belongings, giving King all the time he needed to destroy any and all exculpatory evidence favorable to the defense." (Doc. 1 at 24.) Giddings surmises this unidentified "evidence" became "exculpatory" because King had a motive to lie and Ekola "permanently and intentionally destroyed the exculpatory information" in bad faith. *Id*. Likewise, Giddings states Ekola summarized his 40 witness interviews in a 1 ½ page memorandum and summarized his initial two interviews with King, that together lasted more than 2 hours, in a 23-line memorandum. *Id*. at

24-25.  According to Giddings, these summaries "offer very compelling evidence that an extreme amount of exculpatory, or even potentially exculpatory evidence was forever lost in prejudice to the defense."  *Id.* at 25.  Following a third interview of King, Ekola apparently advised the parties that while he had "not coerced a confession out of King" he did have information that King was at Amy's house on the day of her murder.  *Id.*  Giddings claims Ekola destroyed these notes, too, causing extreme prejudice to the defense.  *Id.*

Giddings argues the Montana Supreme Court's denial of his claim on direct appeal resulted from an unreasonable determination of the facts, because once the interview notes were collected as part of the investigation, "they are presumed exculpatory for the purposes of investigative leads, cross-examination, and defense preparation."  *Id.*  Giddings asserts huge amounts of "exculpatory information and evidence exist[s] that coincides with witness interviews."  *Id.*  Giddings also believes the Montana Supreme Court's decision upholding the trial court's denial of his motion to dismiss constituted an unreasonable application of *Brady v. Maryland*.  *Id.* at26.

The rule established in *Brady v. Maryland*, 373 U.S. 83 (1963), requires the prosecution to disclose materially exculpatory evidence in its possession to the defense.  A *Brady* violation occurs when: 1) evidence is favorable to the accused because it is exculpatory or impeaching; 2) the evidence is not disclosed by the

prosecution; 3) the nondisclosure results in prejudice to the accused. *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985); see also *Kyles v. Whitley*, 514 U.S. 419, 433-434 (1995). In assessing the issue of materiality, the court must review the trial record and decide whether it remains confident that the outcome would be the same even if the jury heard the suppressed evidence. See, *Kyles*, 514 U.S. at 434 ("The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence."). Where the lost evidence is only potentially exculpatory, rather than apparently exculpatory, the defendant must show bad faith by the state in order to establish a due process violation. *Arizona v. Youngblood*, 488 U.S. 51, 57-58 (1988).

The Montana Supreme Court held that Giddings failed to meet the first prong of the *Brady* test because he failed to show the State destroyed exculpatory evidence- Giddings could not demonstrate that Ekola's handwritten notes contained information favorable to the defense. See, *State v. Giddings*, 2009 MT ¶ 50. Additionally, Giddings failed to show a reasonable probability that having access to Ekola's notes would have altered the outcome of his trial. *Id.* Giddings's

"speculation and conjecture about the exculpatory value of the notes and the possibility that those notes might have changed the outcome of the trial" did not establish a due process violation.  *Id*.

Moreover, the Court held that Giddings failed to establish Ekola acted in bad faith.  Ekola testified that he destroyed the notes after transcribing the relevant information into his final report.  *Id*. at ¶ 51.  Giddings posited that Ekola should have kept his notes because they may have contained exculpatory information.  But the Montana Supreme Court held that such unsupported assertions and suppositions fell short of establishing bad faith under *Youngblood*.  *Id*.

Giddings's factual assertions before this Court fail to demonstrate that any of the information possessed and ultimately "destroyed" by Ekola was, in fact, exculpatory.  As he did below, Giddings simply advances his own personal beliefs and conclusory statements regarding what the interviews, and Ekola's corresponding handwritten notes, may have shown.  Additionally, Giddings provides no support for his proclamation that, once collected, interview notes are "presumed exculpatory."  Likewise, he provides not one example of exculpatory information that would have been gleaned from the 40 witness interviews.  And, as the Montana Supreme Court noted, Giddings was provided with Ekola's typed reports and summaries of each interview.  Not only was Giddings free to interview Ekola regarding the substance of each interview, Ekola was also subject to

extensive cross examination in the course of multiple pretrial hearings and also during trial.

Giddings has failed to demonstrate that any of the information purportedly withheld was exculpatory under *Brady,* or even potentially exculpatory under *Youngblood*.  Moreover, he has not established: that Ekola acted in bad faith; that the state suppressed information to which he was entitled; or a reasonable probability that if he had had Ekola's notes or recorded interviews, the jury's verdict would have been different.  In short, Giddings has not shown that the Montana Supreme Court's ruling was lacking in justification or constitutes an error of existing law.  See, *Richter*, 562 U.S. at 103.  Because he has not met his burden, this Court must afford AEDPA deference to the state court decision.  Claim 7 should be denied.

Giddings also alleges the Montana Supreme Court erred in affirming the denial of his motion to dismiss based upon the state's failure to provide discovery. Giddings claims a large number of items were turned over in an untimely manner.[35]  Due to this late disclosure, the defense team was disadvantaged and

---

[35] These items apparently included: criminal history of Shannon Rawlins; identification of exculpatory witnesses of the roommates of jailhouse informants; inmates who were housed with King and other potential witnesses; transcripts of witness interviews of Ryan Frankforter and Valerie Smith; State Crime Lab Reports and test results, and "a great deal" of FBI information and reports.  (Doc. 1 at 28.)

forced to pour over this information just prior to trial, making it impossible to adequately prepare.  (Doc. 1 at 28.)  Because Giddings only had two hours of time with Avignone and Bannick, he claims he was constructively denied counsel and "prejudice is presumed."  *Id.*

Giddings acknowledges these alleged abuses were the subject of the writ of supervisory control, but contends the Montana Supreme Court erred when it declined to address the merits of his claims and dismissed the matter without prejudice finding Giddings had an adequate remedy on direct appeal.  *Id.*  Giddings then claims on direct appeal that the Montana Supreme Court arbitrarily and prejudicially denied his discovery abuse claim, in contravention of *Brady*.  *Id.* at 28-29.

The Montana Supreme Court first determined that Giddings failed to establish with any specificity that the state possessed evidence that was favorable to the defense. Giddings did not identify any evidence that was exculpatory or establish that there existed a reasonably probability that such evidence would have changed the outcome on appeal.  *State v. Giddings*, 2009 MT at ¶ 60.  Giddings only made "sweeping generalizations and broad accusations" but failed to point to any specific evidence that would have cleared him of guilt.  Accordingly, Giddings failed to meet the elements necessary to prove a *Brady* violation.  *Id.*

Additionally, Giddings failed to prove that he was denied a fair trial due to the State's actions or purportedly depriving him of effective assistance of counsel or of his right to confrontation. The Court noted that Giddings had three very experienced trial attorneys that had seventeen months to prepare for trial. *Id*. at ¶ 61. "Giddings trial lasted for more than two weeks. His lawyers, with decades of combined experience, cross-examined the State's witnesses at length and repeatedly impeached their testimony. Giddings's lawyers effectively advocated for him, and did far more than merely accompany him in court." *Id*. at ¶ 62.

Giddings's claim before this Court suffers from the same fault as it did on direct appeal. Much like his claim in relation to Detective Ekola's handwritten notes, Giddings has not pointed to any item, purportedly withheld, that is exculpatory in nature. The Montana Supreme Court noted on direct appeal that Giddings had been granted five extensions to file his opening brief, and even "with the benefit of an additional year, fail[ed] to establish with any specificity that the State possessed any evidence favorable to the defense." *Id*. at ¶ 60. The same remains true, yet ten additional years have passed and Giddings still cannot direct this Court to the withheld evidence that would support his claim. Additionally, as set forth above, these same issues were litigated as the subject of pretrial hearings, and were presented to the Montana Supreme Court twice. Giddings's conclusory

statements before this Court are insufficient to demonstrate that the Montana Supreme Court unreasonably denied his claim.

Giddings also asserts he was denied disclosure of "inculpatory" evidence. (Doc. 1 at 28.)  But *Brady* is not concerned with the defense's ability to prepare for trial, if it were, *Brady* "would necessarily encompass incriminating evidence as well as exculpatory evidence, since knowledge of the prosecutor's entire case would always be useful in planning the defense."  *United States v. Agurs*, 427 U.S. 97, 112 n. 20 (1976).  Because *Brady* does not provide for the disclosure of inculpatory evidence, this Court will not interpret it so broadly as to apply to the defense's trial preparation.  See e.g., *Bagley*, 473 U.S. at 675.  Regardless of the nature of Giddings's claims, he has not met his burden under 28 U.S.C. § 2254(d) and this Court must afford deference.  Claim 9 should also be denied.

### iii.    Claim 8- Videotape Evidence in Jury Deliberations

As set forth above, during trial the State offered into evidence videotape of an interview of Giddings[36] conducted by two Helena police officers, edited to remove irrelevant material.  Giddings did not object to playing the video, but argued it should not go into the jury room.  The jury was provided a transcript of

---

[36] Giddings was apparently interviewed twice, just after midnight following the shooting and again that same morning.  The videotape was an edited version combining both of these interviews.

the video during trial, but they were advised the transcript would not go to the jury room with them.

Prior to submitting the case to the jury, the State argued the videotape should be allowed into the jury room.[37]  Giddings objected arguing that the videotape was cumulative and placed undue emphasis on Giddings's statements, to the detriment of other testimony presented.  The district court noted the video was not testimony, but rather was a statement.  Giddings again objected.  The state argued Giddings's statements were not testimonial in nature and believed the videotape was admissible because it showed Giddings's demeanor and was probative of his state of mind and behavior during the night following the murder.  Giddings's defense conceded, under state law, that the district court had the discretion to allow the videotape into the jury room.  The district court determined the videotape was not Giddings's testimony, and, had he testified, the videotape would not go into the jury room, but would only be used for impeachment purposes.  The district court likened the videotape to a DUI video and observed it constituted Giddings's statement which was voluntarily given that night.

On appeal, Giddings argued the district court erred, and violated his right to due process, by allowing the videotape into the jury room, because the jury's

_____

[37] The discussion of the videotape evidence in the trial transcript can be found at (Doc. 19-21 at 113-116.)

possible review of the video during deliberations unduly emphasized his demeanor and statements.  The Montana Supreme Court, noting the district court's discretion, observed state statute at issue provided juries may take into deliberations any exhibit admitted into evidence "that in the opinion of the court will be necessary." See, *State v. Giddings*, 2009 MT at ¶ 96, (citing MCA § 46-16-504).

The Court did not address the question of whether or not the videotape was testimonial in nature, because it found Giddings was not prejudiced by the item being allowed into the jury room.  Analyzing the matter under state law, the Court found that Giddings did not claim, and the record did not show, that the statements on the videotape conflicted with testimony given by other witnesses during trial, nor did Giddings claim the tape was critical to the State's case.  *Id*. at ¶ 97.  The Court found the video had limited evidentiary value due to its poor audio and visual quality.  *Id*.  Further, the Court found allowing the videotape to accompany the jury into deliberations did not unduly emphasize Giddings's interview to the exclusion of other witnesses, it was, at worst cumulative in nature.  *Id*. at ¶ 98.

Giddings now argues before this Court that he was prejudiced and the finding of the Montana Supreme Court was unreasonable.  Specifically, he claims the State "suppressed" a separate video, purportedly taken while he was in a holding cell for several hours, prior to the videotaped interview.  See, (Doc. 1 at 27.)  Giddings claims that he was handcuffed with his hands behind his back and

forced, by government agents, to "eat a sandwich and drink water like a dog." *Id*.

Giddings claims he became agitated and invoked his right to an attorney on

multiple occasions; his requests were denied.  It was only then, after being

provoked and agitated, that Giddings claims he was moved into the interview room

where his interactions with the officers were taped.  *Id*.  Giddings seems to argue

that his demeanor and agitation, as represented on the videotape, was a result of

prior intentional provocation by the officers which he cannot now prove due to the

"suppressed" holding cell video.  *Id*.  But such an argument was never advanced on

direct appeal,[38] or in postconviction proceedings.[39]

    To the extent that Giddings takes issue with the Montana Supreme Court's

application of state law, such a claim is not cognizable in federal habeas.  *Estelle v.

McGuire*, 502 U.S. 62, 67-68 (1991) (federal habeas corpus relief does not lie for

errors of state law); see also *Pulley v. Harris*, 465 U.S. 37, 41 (1984).  Further, to

the extent that Giddings now seeks to assert a violation of his right to counsel, or

some other federal constitutional malfeasance in support of his attempt to

demonstrate prejudice from the videotape, such a claim finds no support in the

record and will not be addressed for the first time by this Court.

---

[38] See e.g., *State v. Giddings*, DA 07-0333, Br. Appellant, at 51-55 (filed Feb. 5, 2008); *State v. Giddings*, DA 07-0333, Appellant Reply, at 16-18  (filed Aug. 13, 2008);  *State v. Giddings*, DA 07-0333, Pet. Reh'g, at 7-9 (filed March 17, 2009).
[39] See, Section II.E, supra.

The Montana Supreme Court's denial of this claim was not contrary to, or an unreasonable application of, clearly established federal law, see 28 U.S.C. § 2254(d)(1), and was not "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The claim does not warrant federal habeas relief.

### iv.     Claim 10-Endorsement of Jailhouse Informants

Giddings claims the Montana Supreme Court unreasonably denied his claim that his rights were violated when the district court allowed the late disclosure, and corresponding trial testimony, of two jailhouse informants, Mulchay and Gillette. Giddings contends the defense relied upon the State's August 2006 representation that it would not be calling any additional informants, aside from Shannon Rawlins. Thus, the defense did not seek extensive discovery relating to either Mulchay or Gillette. As a result, Giddings was forced to proceed to trial without adequate time to prepare for the examination of either witness. See, (Doc. 1 at 29-30.)

Apparently, Gillette talked with Ekola in October of 2005 and indicated he had information that both King and Giddings had been involved in Amy's murder. But in exchange for this information, Gillette wanted Ekola's assistance in resolving a parole violation issue he was having in New York state. Apparently, Gillette also told Ekola that King had a journal which contained a story about a

58

homicide.[40]  Ekola declined to provide the requested favorable treatment to Gillette.  The exchange was documented in a report and Ekola obtained no additional information from Gillette at the time.  See, *Giddings*, 2009 MT 61, at ¶ 65; see also, (Doc. 19-9 at 13-14;16) (Ekola's testimony at 1/2/07 hrg. regarding Gillette interview).

Gillette subsequently contacted Ekola on December 5, 2006, and indicated he now wished to volunteer information which he had obtained while incarcerated with Giddings regarding Giddings's purported involvement in Amy's murder.  (Doc. 19-9 at 14.)  Unlike the time before, Gillette did not seek any favors in exchange for providing the information.  *Id*.

The State moved to add Mulcahy as a witness on December 21, 2006; Giddings filed a second motion to dismiss in response.  The addition of both witnesses was discussed at the January 2, 2007 hearing; the district court allowed both witnesses to testify at trial.

On appeal, Giddings argued jailhouse snitches are inherently unreliable and cross-examination is not an adequate tool to protect a defendant's rights. *Giddings*, 2009 MT 61, at ¶ 67.  Additionally, Giddings claimed that he lacked sufficient time or information to properly prepare for and impeach Gillette and

---

[40] Apparently, Giddings told Gillette that King had written a poem in his journal in which he confessed to killing Amy.  See e.g., Gillette testimony (19-12 at 174-75.)

Mulcahy.  *Id*.  The State argued that neither Gillette nor Mulcahy were jailhouse informants because neither witness testified in return for inducements or favorable treatment.  *Id*. at ¶ 68.

The Court observed Giddings failed to establish that either witness received compensation or personal gain for their testimony, accordingly, the Court examined whether or not the district court abused its discretion in allowing the witnesses to testify.  *Id*. at ¶¶ 69-70.  The Court noted that Giddings knew Gillette and Mulcahy were potential witnesses[41] and that the State had a standing offer to allow Giddings to examine its file.  *Id*. at 71.  Further, the Court determined defense counsel's detailed cross examination of Gillette, including addressing his past crimes, belies the assertion that there was insufficient time to prepare.  *Id*.

Giddings further argued Mulcahy's testimony that Giddings attempted to implicate King in the murder suggested to the jury that Giddings lied.  *Id*. at ¶ 73.  The Court was not persuaded, noting on direct exam that Mulcahy recounted Giddings's claim that King had been involved in the murder.  Defense counsel, in turn, elected not to impeach Mulcahy on his criminal history, but instead elicited

---

[41] Giddings was aware of Ekola's October 2005 report detailing the meeting and potential nature of Gillette's testimony.  In July of 2006, Giddings filed a motion to compel that indicated he was aware Mulcahy might testify.  Additionally, the State provided Mulcahy's NCIC report to the defense in November of 2006. See, *Giddings*, 2009 MT 61, at ¶¶ 71-72.

more testimony regarding Giddings's assertion that King was the murder.  *Id*.  The testimony at issue shed a negative light on King, not Giddings.  *Id*.

The Court determined the district court did not act arbitrarily in its decision to allow the two men to testify and that Giddings did not suffer a substantial injustice.  *Id*. at ¶ 74.  Accordingly, there was no abuse of discretion.

Before this Court, Gillette argues the Court erred in its finding that neither Gillette nor Malachy were jailhouse informants.  While Giddings primarily focuses on Gillette, in relation to Mulcahy, Giddings asserts his testimony that Giddings adamantly denied being involved in or present for Amy's murder, conflicted with Gillette's testimony and only served to "mislead the jury" and was a tactic used to "focus attention away from the truth."  (Doc. 1 at 31.)  But Mulchay was not subject to a rigorous cross-examination precisely because his testimony was seemingly helpful to the defense and supported the theory that King was the murderer.  See (Doc. 19-17 at 143-146.)  To Mulchay, Giddings consistently denied killing Amy and explained he was only involved after the fact when King gave him the bag of items taken from the house.  *Id*. at 145-46.

In relation to Gillette, Giddings argues that because Ekola was aware in October of 2005 that Gillette had information which he was willing to share in exchange for assistance from Ekola, as documented in Ekola's report, the State's subsequent argument that Gillette came forward with "new and valuable"

information in December of 2006 was disingenuous. (Doc. 1at 30.)  Giddings

asserts the defense was left without ample time to prepare for Gillette's cross

examination.  *Id*. at 31.[42]

As a preliminary matter, Giddings has not established that either Mulcahy or

Gillette received any material benefit from the prosecution for their testimony.[43]

Thus, Giddings has failed to establish that either individual was a "snitch" or

informant.  Further, Giddings has not demonstrated that the Montana Supreme

Court's decision upholding the district court's refusal to treat either as an

informant was unreasonable.

---

[42] Giddings also faults the state for not timely recovering King's notebook, which
purportedly contained details of Amy's murder.  *Id*. at 31-32.  This issue, however,
was not raised on direct appeal.

[43] See e.g.,  Gillette examination (Doc. 19-12 at 196):
Q: Okay. So were there any promises made to you after you were sentenced until
the time that you talked to Detective Ekola? Any deals made between you and the
state on anything?
A. No, sir, none whatsoever.
Q. And when you asked Detective Ekola to help you out with your New York
problem--
A. Yes, sir.
Q. --Did he help you out?
A. No, sir.

See also, Mulchay examination (Doc. 19-17 at 133):
A: I'd gotten in touch with detectives.
Q: Okay, and were you given any promises or—
A: No, sir.

Gillette testified at trial.[44] On direct examination, Gillette explained that he and Giddings were incarcerated together.  Gillette stated that initially, Giddings denied having anything to do with Amy's murder.  *Id.* at 149.  Subsequently, following a verbal altercation between Giddings and King at the jail, Giddings asked if he and Gillette could speak in confidence.  Giddings then disclosed his involvement in Amy's murder.  Giddings explained that he stopped by the Vook residence to collect drug money from Mike Mix.  *Id.* at 148.  Mix was not there, but Amy was; Giddings and Amy got into a heated argument.  The argument got out of hand and Giddings ended up hitting Amy repeatedly.  Amy fell down bleeding and Giddings got scared and left.  *Id.*  According to Gillette, Giddings could not "finish the deal," meaning kill Amy, so he called on King who did.  *Id.* at 151.  Gillette also testified that Mix was not involved in the murder, but was involved in cleaning up the murder scene.  *Id.* at 153.

Prior to the cross-examination, there was an in chambers conference wherein the parties discussed the cross-examination of Gillette, including Gillette's criminal history, Gillette's potential expectation of receiving favorable treatment for his testimony, and Gillette's relationship with Ekola, See, (Doc. 19-12 at 155-162; 164-171)  It appears the defense had been supplied with an NCIC report, a

---

[44] See, Trial Trns. (Doc. 19-12 at 141-155; 171-201.)

copy of Gillette's state presentence investigation report, a police report, and criminal Informations and Judgments. *Id*. at 165-66; 170-71. Defense counsel acknowledged the issue of Gillette testifying had been briefed and addressed prior to trial and, correspondingly, that the district court had ruled to allow wide latitude in the cross examination. *Id*. at 158-59. Additionally, it appears the defense was quite familiar with Gillette and his criminal history, Randi Hood had previously represented him. *Id*. at 160; 161-62;166.

Gillette was subject to a rigorous cross-examination which addressed his criminal thinking and a potential desire to be helpful to Ekola's investigation into Giddings in order to curry favor. See generally, *Id*. at 171-189. Gillette acknowledged that he initially offered to provide information to Ekola in exchange for assistance in resolving the New York warrant and getting into the bootcamp program. *Id*. at 177-78. Gillette also acknowledged he had been convicted of forgery and multiple robberies, that he had engaged in a dishonest scheme, and that his nickname was "Johnny Trouble." *Id*. at 182-84. Although he was no longer in custody, Gillette admitted he did not want to anger law enforcement, including Ekola, because he had 13 years of probation hanging over his head. *Id*. at 187-89.

Thus, contrary to Giddings's assertions, a review of the record reveals that defense counsel was adequately prepared and performed a thorough cross-examination of Gillette. It does not appear that Giddings was prejudiced by the

testimony or either Mulchay or Gillette. The Montana Supreme Court reasonably denied this claim.

### v.    Claim 11- Cross-Examination of King/Actual Innocence

As explained above, in relation to the limitations placed upon the cross examination of King, the Montana Supreme Court held that while a defendant may introduce "reverse 404(b) evidence" to inculpate another and exculpate himself, when seeking to offer evidence of prior bad acts, the defense must articulate how the evidence fits into a chain of logical inferences.  The evidence may not be introduced when it lacks connection with the crime, is speculative or remote, or does not tend to prove a material fact at issue.  *See, Giddings*, 2009 MT 61, at ¶ 88. The Court held that much of the evidence Giddings attempted to offer was inadmissible because it violated M.R.Evid. 404(b)'s prohibition on evidence of character offered to show conformity therewith.  *Id.* at ¶¶ 89-90; 92-93.  The Court also held that Giddings failed to create a chain of logical inferences, that is, that the proffered evidence tended to prove or disprove a material fact.  *Id.* at ¶ 93.

But federal habeas relief is not available for alleged error in the interpretation or application of state law.  *Estelle*, 502 U.S. at 67-68; *Park v. California*, 202 F. 3d 1146, 1149 (9th Cir. 2000).  Accordingly, "evidentiary rulings based on state law cannot form an independent basis for habeas relief."  *Rhoades v. Henry*, 638 F. 3d 1027, 1034 n. 5 (9th Cir. 2011).  The Supreme Court has

acknowledged a "traditional reluctance to impose constitutional restraints on ordinary evidentiary rulings by state trial courts." *Crane v. Kentucky*, 476 U.S. 683, 689 (1986).  Thus, to the extent that Giddings claims the state courts erred in their application of the Montana rules of evidence, such a claim is not cognizable in federal habeas.

A state court's evidentiary ruling, even if erroneous, is grounds for federal habeas relief only if it renders the state proceedings so fundamentally unfair as to violate due process.  *Estelle*, 502 U.S. 68-70; see also, *Dillard v. Roe*, 244 F. 3d 758, 766 (9th Cir. 2001). Habeas relief is thus only available if an evidentiary ruling was arbitrary, disproportionate to the end it was asserted to promote, or so prejudicial that it rendered the trial fundamentally unfair.  See, *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006); *Walters v. Maass*, 45 F. 3d 1355, 1357 (9th Cir. 1995).

Thus, if a state trial court erred in admitting evidence and that error violated a petitioner's rights under the United States Constitution, in order to be entitled to federal habeas relief, a petitioner must still show that the error "had a substantial and injurious effect or influence in determining the jury's verdict" and that he suffered actual prejudice, that is, a "reasonable probability" that the jury would have reached a different result but for the error.  *Brecht v. Abrahamson*, 507 U.S.

619, 637 (1993); *Fry v. Pliler*, 551 U.S. 112, 121-22 (2007).  Giddings has not made such a showing.

Giddings asserts that the state and Ekola conspired to wrongfully accuse and convict him.  Giddings sets forth a lengthy recitation of various witness' testimony presented during trial that he believes exculpates him and establishes he could not have been present for Amy's murder.  See, (Doc. 1 at 32-35.)  Giddings seems to assert that a de novo review of this information and trial testimony demonstrates his actual innocence and the corresponding invalidity of his conviction under the standards set forth in *Sclup v. Delo*.  *Id*. at 32.

But, as Giddings acknowledges in his filing, all of this testimony came into evidence at trial.  The jury heard the testimony and concluded that Giddings was guilty.  Further, Giddings does not show how the district court's limitation of the cross-examination of King ties into this testimony. Giddings sets forth the lines of questioning that were excluded, which Giddings again asserts would have supported his defense of third-party culpability by establishing that King was the killer. (Doc. 1 at 8-9.) But this is the very same information considered and rejected by the state courts, as discussed above.  See, p. 7-8; 11-13, *ante*.

Giddings essentially argues that King was a violent man, therefore, he must have killed Amy. But, as explained at length by the Montana Supreme Court, that is the exact inference M.R. Evid. 404(b) seeks to exclude.  While Giddings may

disagree with this evidentiary ruling, he has not made a showing that the ruling "had a substantial and injurious effect" on the verdict or that there is a "reasonable probability" that the jury would have reached a different verdict, but for the evidentiary ruling. *Brecht*, 507 U.S. at 637. This portion of the claim should be denied.

Additionally, in relation to the "newly discovered evidence" presented during Giddings's postconviction hearing, Giddings has failed to demonstrate that the state courts unreasonably denied the claim.  On the stand Hamlin denied providing his previous statement to Fullerton, denied knowing King, and denied overhearing the conversation he had told Fullerton about years earlier in which King purportedly made an admission about "getting away" with something. Further, Neuhaus did not testify at the PCR hearing.  There is nothing before this Court to indicate whether or not Neuhaus actually said the things listed in Fullerton's affidavit regarding the violent relationship between King and Amy.

"Actual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar ... [or] expiration of the statute of limitations." *McQuiggin v. Perkins,* 569 U.S. 383, 386 (2013).  When an otherwise time-barred habeas petitioner "presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of non-harmless constitutional error," the Court

may consider the petition on the merits. *See Schlup v. Delo,* 513 U.S. 298, 316 (1995).[45]

But the problem before this Court is that Giddings presents no newly discovered evidence of his actual innocence.  Additionally, *Schlup* is inapplicable because Giddings is not seeking this Court's review of a time-barred or procedurally defaulted claim.  Rather, Giddings asks this Court to review the decision made by the state courts denying his actual innocence claim.  As set forth above, the state courts refused to perform a full analysis of the claim under state law, because Giddings did not make a threshold showing that the proffered evidence, specifically Hamlin's testimony, was reliable.  See, (Doc. 1 at 35-36.) Giddings also faults the state court for not considering the information Neuhaus purportedly provided to Fullerton, because Neuhaus did not testify at the postconviction hearing.  *Id*. at 36.  But Giddings presents nothing new before this

---

[45]The Supreme Court has cautioned, however, that "tenable actual-innocence gateway pleas are rare." *McQuiggin,* 133 S.Ct. at 1928. "[A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Id.* (citations omitted); *see also House v. Bell,* 547 U.S. 518, 538 (2006) (emphasizing that the *Schlup* standard is demanding and seldom met). This exacting standard sets an extremely high bar and permits review only in the "extraordinary" case. *Schlup,* 513 U.S. at 324–27 (emphasizing that "in the vast majority of cases, claims of actual innocence are rarely successful"). Under *Schlup,* the Court must "assess how reasonable jurors would react to the overall, newly supplemented record," including all the evidence the petitioner now proffers. *Lee v. Lampert,* 653 F.3d 929, 945 (9th Cir.2011).

Court that would either undermine confidence in the jury's verdict or make the *Schlup* gateway applicable to his case.

Accordingly, Giddings cannot demonstrate that the Montana Supreme Court's denial of his actual innocence claim was unreasonable. This claim should be denied in its entirety.

### vi.    Claim 12-Violation of Order in Limine

As set forth above, the district court denied Giddings's motion for a mistrial based upon the State's alleged violation of the court's order in limine excluding "any testimony or other evidence concerning whether [Amy] disliked or was afraid of Giddings." The Montana Supreme Court upheld the ruling. Giddings claims this decision resulted from an unreasonable determination of the facts as presented on appeal. (Doc. 1 at 37.)

The first alleged violation of the order occurred when Ekola testified that Rick Strobel, an associate of Giddings, advised Ekola that King "would have been afraid of Giddings." *See, Giddings*, 2009 MT 61, at ¶ 75. Although Giddings takes issue with the testimony before this Court, see (Doc. 1 at 7), the Montana Supreme Court reasonably found there was no violation of the order. The order pertained to Amy and was not concerned with whether or not King disliked or was afraid of Giddings.

70

During her examination, Amy's mother, Candice, stated that upon receiving a call from Giddings, Amy's physical demeanor was "scared."  Giddings objected in chambers to this statement, so as not to call additional attention to it.  *Id.* at ¶ 79.

Additionally, during King's examination, he testified about going to the residence of Chris Rolfe, Amy's ex-husband.  King explained that Giddings and Strobel talked while King went inside, the following exchange occurred during trial:

> Q:     So after you saw Strobel, you went into the house?
>
> A:     No, not- there was conversations before I went in.
>
> Q:     Okay.  Was Giddings a party to that conversation?
>
> A:     Yes, he was out there.
>
> Q:     Okay.  And tell us about that conversation.
>
> A:     Rick Strobel, as he was coming through, he said he didn't want Giddings- that Mr. Giddings couldn't go in there.
>
> Q:     Okay.
>
> A:     Amy specifically said- Amy-

*Id.* at ¶ 80.  Giddings's counsel objected before King finished his answer.  After arguing the issue in chambers, the district court denied Giddings's motion for a mistrial.

The Montana Supreme Court affirmed finding that the disputed portions of Candice's and King's testimony "individually or collectively did not deny Giddings 'a fair and impartial trial.'" *Id*. at ¶ 82.  The Court held that the statement concerning Amy being "scared" did not constitute the type of direct other crimes evidence that "inevitably involves prejudice to the defendant." *Id*. at ¶ 84 (citations omitted).  Additionally, the defense objected before King told the jury what it was that "Amy specifically said." *Id*.  The Court further found that during trial overwhelming evidence was presented linking Giddings to Amy's murder and the disputed portions of this testimony constituted "small parts of a complex three-week trial." *Id.*

Giddings seems to argue that the denial of the defense's motion for a mistrial was prejudicial and invalid on its face due to the highly prejudicial nature of the testimony elicited.  See, (Doc. 1 at 40, ¶g.)  But Giddings has not established that the denial of his motion for a mistrial rendered his trial so fundamentally unfair so as to violate his right to due process.  See, *Estelle*, 502 U.S. 68-70.  The Court noted the overwhelming amount of evidence tying Giddings to Amy's murder and that the admission of these two statements did not result in the denial of a fair trial. Given the evidence against Giddings, he cannot show a "reasonable probability" that the jury would have reached a different result but for the admission of these two statements. *Brecht*, 507 U.S. at 637.

Giddings has failed to establish that the Montana Supreme Court's decision was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Further, because "fairminded jurists could disagree" on the correctness of state court's decision, federal habeas relief is precluded. *Harrington,* 562 U.S. at 101. Or, put another way, the Montana Supreme Court's denial of this claim was reasonable. The claim should be denied.

### vii.   Claim 14- Cumulative error

Giddings claims he should be granted relief based upon cumulative error. (Doc. 1 at 39-41.) "Cumulative error applies where, 'although no single trial error examined in isolation is sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors may still prejudice a defendant. *Mancuso v. Olivarez*, 292 F. 3d 939, 957 (9th Cir. 2002) (quoting *U.S. v. Frederick*, 78 F. 3d 1370, 1381 (9th Cir. 1996); see also, *Parle v. Runnels*, 505 F. 3d 922, 928 (9th Cir. 2007) ("The Supreme Court has clearly established that the combined effect of multiple trial errors may give rise to a due process violation if it renders a trial fundamentally unfair, even where each error considered individually would not require reversal."). This Court has considered and rejected each of Giddings's claims. None of the errors alleged, evaluated individually or together, constitutes constitutional error. Because there is nothing to accumulate to a level of a

constitutional violation, Giddings's cumulative error claim fails as well. See, *Mancuso*, 292 F. 3d at 957. ("Because there is no single constitutional error in this case, there is nothing to accumulate to a level of a constitutional violation).  This claim should be also denied.

### D. Conclusion

Giddings petition should be denied.  His claims relative to his PCR counsel and proceedings are not cognizable in federal habeas.  To the extent that Giddings presented a potentially cognizable claim of ineffective assistance of trial counsel for failing to secure his presence at pretrial hearings, Giddings failed to make the requisite showing under *Martinez* to excuse the procedural default of the claim. Likewise, Giddings's claim of evidence tampering was never presented to the state courts and is now procedurally defaulted.  The remainder of Giddings's claims do not survive deferential review under AEDPA.  Finally, Giddings did not make an adequate showing of cumulative error.  The petition should be denied in its entirety.

### Certificate of Appealability

"The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  Rule 11(a), Rules governing § 2254 Proceedings.  A COA should issue as to those claims on which a petitioner makes a "substantial showing of the denial of a constitutional right."  28 U.S.C. §

2253(c)(2).  The standard is satisfied if "jurists of reason could disagree with the district court's resolution of [the] constitutional claims" or "conclude the issues presented are adequate to deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

Giddings has not made a substantial showing that he was deprived of a constitutional right.  Accordingly, this Court must afford deference to the Montana Supreme Court's resolution of the majority of his claims.  As set forth above, the remaining claims are either not cognizable in federal habeas or are procedurally defaulted without excuse. There are no close questions and there is no reason to encourage further proceedings in this Court.  A certificate of appealability should be denied.

Based on the foregoing, the Court enters the following:

## RECOMMENDATION

1.  The Petition (Doc. 1) should be DENIED.

2.  The Clerk of Court should be directed to enter by separate document a judgment in favor of Respondents and against Petitioner.

3. A certificate of appealability should be DENIED.

**NOTICE OF RIGHT TO OBJECT**
**TO FINDINGS & RECOMMENDATION**
**AND CONSEQUENCES OF FAILURE TO OBJECT**

Mr. Giddings may object to this Findings and Recommendation within 14 days. 28 U.S.C. § 636(b)(1). Failure to timely file written objections may bar a de novo determination by the district judge and/or waive the right to appeal.

Mr. Giddings must immediately notify the Court of any change in his mailing address by filing a "Notice of Change of Address."  Failure to do so may result in dismissal of his case without notice to him.


DATED this 21st day of October, 2020.

/s/ John Johnston
John Johnson
United States Magistrate Judge